## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| BRYAN NAMOFF<br>1851 Magellan Drive<br>Oakland, CA 94611,<br><br>                     Plaintiff,<br><br>   vs.<br><br>CHAIKIN, SHERMAN, CAMMARATA &<br>SIEGEL, P.C.,<br>1232 17th Street NW<br>Washington, DC 20036,<br><br>     and<br><br>JOSEPH CAMMARATA,<br>1232 17th Street NW<br>Washington, DC 20036,<br><br>     and<br><br>FLEISHMAN & SHAPIRO, P.C.,<br>2000 S. Colorado Blvd., Suite 9000<br>Denver, CO 80222,<br><br>     and<br><br>STEVEN A. SHAPIRO<br>2000 S. Colorado Blvd., Suite 9000<br>Denver, CO 80222,<br><br>                  Defendants. | **C.A. No.** |

## COMPLAINT FOR DAMAGES

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................1

II.  JURISDICTION AND VENUE ..........................................................................4

III.  THE PARTIES .....................................................................................................4

    A.  Plaintiff ....................................................................................................4

    B.  Defendants ...............................................................................................5

    C.  Other Involved Entities in the Dismissed Litigation................................6

IV.  ALLEGATIONS COMMON TO ALL COUNTS ..............................................7

    A.  Plaintiff's Concussion and the Standards for Treating a Concussion
        Which Were Not Followed .......................................................................7

    B.  Defendants File Mr. Namoff's Lawsuits ...............................................15

    C.  Defendants Negligently Failed to Identify and Disclose Documents
        Requested During Discovery and Negligently Misrepresented Material
        Facts Related to Namoff's Claims, Which Lead to a Motion for Sanctions
        Against Namoff and Defendants..............................................................17

    D.  To Hide Their Negligence, Defendants Coerced Namoff Into Dismissing
        His Medical Malpractice Claims and Disclaiming Defendants' Conflicts of
        Interest.....................................................................................................26

    E.  The Damage to Namoff ..........................................................................30

V.  CAUSES OF ACTION .......................................................................................31

COUNT I  FRAUD AND FRAUDULENT INDUCEMENT ......................................31

    A.  First Instance – The Sanctions Motion Was Directed Solely To Namoff ............31

    B.  Second Instance – The False Threats To Namoff...................................32

    C.  Third Instance – Failure to Advise Namoff to Seek Counsel ................33

    D.  Fourth Instance – Cover Up of Defendants' Own Wrongdoing ............34

    E.  Fifth Instance – Additional Cover Up of Defendants' Wrongdoing.....................35

COUNT II  LEGAL MALPRACTICE – NEGLIGENCE ..........................................36

COUNT III  LEGAL MALPRACTICE – BREACH OF CONTRACT........................38

COUNT IV  LEGAL MALPRACTICE – BREACH OF FIDUCIARY DUTY ...........................39

PRAYER FOR RELIEF .............................................................................................................41

JURY DEMAND ........................................................................................................................41

Plaintiff Bryan Namoff ("Namoff"), by and through his undersigned counsel, brings this action for damages and injunctive relief against Defendants Fleishman & Shapiro, P.C., Chaikin, Sherman, Cammarata & Siegel, P.C., Steven A. Shapiro, and Joseph Cammarata (collectively "Defendants") and in support hereof alleges as follows:

## I.    INTRODUCTION

1.      This action arises out of Defendants' legal malpractice in connection with their representation of Plaintiff in a lawsuit against Major League Soccer team, D.C. United and team medical staff, and D.C. United's outside physicians.  Namoff, a former D.C. United player, suffered a severe concussion during a game and, due to the negligence of D.C. United and the associated medical team, failed to receive the proper treatment.  As a result, Namoff is now unable to sustain any meaningful long-term employment and is facing a lifetime of substantial medical costs.

2.      Mr. Namoff's legal case against D.C. United and its physicians was strong.  The facts strongly supported his claim that D.C. United and the outside physicians for D.C. United negligently treated his concussion and as a result he suffered lifelong injuries.  Plaintiff's case was so strong that the Defendants, who held themselves out as "Preeminent Plaintiffs' Attorneys," took Mr. Namoff's case on a contingent fee basis.  There is a well-established body of scientific literature recognizing that the failure to properly treat a concussion can lead to Post-Concussion Syndrome and Mr. Namoff had consulted with top experts in the concussion treatment field who fully supported his case.  These medical experts supported his case both as to the treating physician's negligence and that this negligence caused his concussion related injuries.  Mr. Namoff's case should have settled or resulted in a verdict in the millions of dollars.  Indeed, Defendants in the complaint they drafted demanded $10 million for medical negligence and $2 million for the impact of Namoff's injuries on his marriage.

- 1 -

3.     A positive outcome for Mr. Namoff was derailed by the negligence of his lawyers.

4.     Mr. Namoff relied on his lawyers with respect to his obligations in responding to discovery requests including the production of documents.  Defendants failed to properly advise Namoff with regard to discovery, failed to produce hundreds of documents Namoff had provided them in connection with the litigation, and failed to produce emails from email accounts Mr. Namoff made available to Defendants.

5.     The defendants in the malpractice litigation were focused on Mr. Namoff's claim that his injuries prevented him from long-term sustainable employment.  They were understandably interested in what work he was able to perform at an entity he formed called Soccer Pros and served discovery to find that out.  Defendants failed to produce documents and emails that related to Mr. Namoff's involvement with Soccer Pros.  Defendants in the malpractice action served discovery on third parties who had information relating to Soccer Pros and other issues in the case.  These parties produced documents Mr. Namoff did not.  A sanctions motion followed.

6.     Defendants could have discovered and produced the documents and come clean to opposing counsel and the Court.  Instead, they withheld the documents—even in the face of an order compelling their production.  Ultimately, because Defendants failed to produce the documents and chose to mischaracterize Namoff's ability to work throughout the litigation, a motion for sanctions was brought against both Defendants and Namoff accusing Namoff and Defendants of a "massive discovery fraud."

7.     But rather than disclosing to their client that they had failed to properly represent him, Defendants decided to throw Mr. Namoff under the bus.  They called for a meeting at the

offices of Defendant Cammarata and presented Mr. Namoff and his wife with an Understanding

Agreement between the Namoffs and Defendants. The agreement was written by the Defendants

before the meeting and purported to report what had transpired at the meeting.  The Namoffs

were not advised to obtain separate counsel due to the conflict that plainly existed from

Defendants' own exposure to the sanctions motion.  Defendants falsely told Mr. Namoff that the

sanctions motion had been brought against him and him alone and further threatened that he was

facing penalties of up to $700,000 in costs and potential criminal prosecution.  At this meeting

Defendants failed to disclose to Mr. Namoff that they had discovered, as documented in an email

discussed below, that they were at fault for at least one portion of the allegations in the sanctions

motion—"It appears that this was my error."  Through their misrepresentations, Defendants were

able to coerce Mr. Namoff into signing the Understanding Agreement agreeing to dismiss his

case.  The agreement also falsely denied the existence of any conflict of interest between

Defendants and Namoff and made Namoff liable for paying Defendants' costs, even though

under his original contingent fee agreement, Defendants agreed to front them. This agreement

was fraudulently obtained as a result of at least five separate but intertwined materially false

statements made by Defendants to induce Mr. Namoff into signing the release, including the

assertion that the sanctions motion was against him only, that Mr. Namoff alone faced $700,000

in fees as a sanction and possible criminal penalties, and that Mr. Namoff was at fault for the

discovery violations.  All of these assertions were materially false and induced Mr. Namoff to

sign releases.

8.       Rather than defending their client against the sanctions motion, Defendants

coerced Namoff to enter into a Settlement and Release Agreement with the medical malpractice

defendants which not only dismissed Namoff's claims against the team doctor, but also forfeited

his right to appeal the previous dismissal of his claims against the team, coach, and athletic trainer.

9.     Plaintiff seeks a voiding of any release against these Defendants and damages arising from their wrongful conduct, including, but not limited to, the amount he would have received in his underlying medical malpractice case had he been represented by competent counsel who had acted in his best interests, and disgorgement of the money paid to Defendants.

## II.     JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1332(a)(1) as the parties are diverse, and the amount in controversy exceeds $75,000.

11.     This Court has personal jurisdiction over Defendants Chaikin, Sherman, Cammarata & Siegel, P.C. and Joseph Cammarata because Chaikin, Sherman, Cammarata & Siegel, P.C. maintains its principal place of business in the District of Columbia and Cammarata is a principal in that law firm.  This Court has personal jurisdiction over all Defendants because they transacted business in the District of Columbia and committed a tortious injury in the District.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as the events that gave rise to this claim occurred in this district.

## III.     THE PARTIES

**A.     Plaintiff**

13.     Plaintiff Bryan Namoff is a resident of Oakland, California and a former professional soccer player who played for Major League Soccer team, D.C. United.

14.     Mr. Namoff has a life-long history with soccer.  Before playing for D.C. United, Mr. Namoff played collegiate soccer for the Bradley University Braves.  He led Bradley

University to two consecutive Missouri Valley Conference finals and their first National Collegiate Athletic Association Tournament appearance.  He was named Bradley Scholar Athlete of the Week on three occasions.  Mr. Namoff was also named to the All-Midwest Region First Team and All-Missouri Valley Conference First Team.  He finished his four-year college career with 32 goals and 17 assists for a total of 81 points.  He is the third-leading scorer in Bradley University history.

15.     Mr. Namoff began playing for D.C. United as a defender in 2001.  He was an important member of the team's back line, playing 195 games, recording 16,045 minutes of play, and notching four goals and 16 assists.  In 2004, Namoff was a vital part of the team, ultimately leading D.C. United to a Major League Soccer Cup victory.  In 2007, Mr. Namoff entered as a substitute for the U.S. Men's National Team in a 3-1 victory against Denmark.  During the 2009 season, prior to his career-ending injury, Mr. Namoff started in 26 games, was off the field for a combined total of only 14 minutes, and registered four assists as well as a career-high two goals, both of which were game winners.  Mr. Namoff continued to be a starter for D.C. United until shortly after he suffered a concussion on September 9, 2009.

16.     In July 2010, Namoff announced he was suspending his playing career after failing to recover from his concussion.

**B.     Defendants**

17.     Defendant Chaikin, Sherman, Cammarata & Siegel, P.C. ("Chaikin & Sherman") is a law firm which, at all times within the scope of this complaint, conducted business and engaged in the practice of law in the District of Columbia, and has its offices at 1232 17th St. NW, Washington, DC 20036.

18.     Defendant Joseph Cammarata ("Cammarata") is a lawyer licensed to practice law in the District of Columbia, D.C. Bar No. 389254.  Cammarata is a principal in Chaikin &

Sherman, and the acts and omissions by Cammarata as described herein were performed in the course and scope of his employment and/or agency relationship with Chaikin & Sherman.

19.     Defendant Fleishman & Shapiro, P.C. ("Fleishman & Shapiro") is a Colorado law firm which, at all times within the scope of this complaint, served as co-counsel to Chaikin & Sherman in its representation of Namoff, and has its offices at 2000 S. Colorado Blvd., Suite 9000, Denver, CO 80222.

20.     Defendant Steven Shapiro ("Shapiro") is a lawyer, licensed to practice law in the State of Colorado, Colo. Bar No. 12928.  Shapiro is a principal in Fleishman & Shapiro, and the acts and omissions by Shapiro as described herein were performed in the course and scope of his employment and/or agency relationship with Fleishman & Shapiro.

**C.     Other Involved Entities in the Dismissed Litigation**

21.     The following are entities who were involved in the litigation filed on Mr. Namoff's behalf by the Defendants.

22.     "D.C. United" refers to the soccer club that is part of the professional soccer league known as Major League Soccer.

23.     Brian Goodstein ("Goodstein") was the D.C. United team athletic trainer.

24.     Tom Soehn ("Soehn") was the head coach of D.C. United.

25.     Christopher Annunziata ("Dr. Annunziata" or "team's outside physician") was the medical doctor who was the designated team physician for D.C. United.

26.     Commonwealth Orthopaedics & Rehabilitation, P.C. ("Commonwealth Orthopaedics") was the medical consulting group contracted by D.C. United.

## IV.     ALLEGATIONS COMMON TO ALL COUNTS

**A.     Plaintiff's Concussion and the Standards for Treating a Concussion Which Were Not Followed**

27.     In the following section, Mr. Namoff outlines the basic facts which gave rise to his claims against D.C. United and Annunziata.  These are the facts which formed the basis for the claims Defendants were pursuing on Mr. Namoff's behalf.

28.     On or about September 9, 2009, Namoff suffered a serious concussion after colliding with another player during a soccer match.

29.     At the time of Mr. Namoff's injury there was a well-recognized consensus in the medical community concerning recognition and treatment of concussed athletes.

30.     In November, 2001, the first International Symposium on Concussion in Sport was held in Vienna, Austria (the "Vienna Conference").  The aim of the Vienna Conference was to provide recommendations for improved safety and health of athletes who suffer concussive injuries in ice hockey, football (soccer), and other sports.  Experts were invited "to address specific issues of epidemiology, basic and clinical science, grading systems, cognitive assessment, new research methods, protective equipment, management, prevention, and long-term outcome, and to discuss a unitary model for understanding concussive injury."

31.     The result of the Vienna Conference was the publication of an international consensus statement which provided "a comprehensive systematic approach to concussion to aid the injured athlete and direct management decisions" ("Vienna Protocol").  The Vienna Protocol was intended to "be widely applicable to sport related concussion" and was "developed for use by doctors, therapists, health professionals, coaches, and other people involved in the care of

- 7 -

injured athletes, whether at the recreational, elite, or professional level."[1/2]  The Vienna Protocol

includes direction with respect to each of the following areas in diagnosing and treating

concussions:  Clinical history; Evaluation; Neuropsychological testing; Imaging procedures;

Research methods; Management and rehabilitation; Prevention; Education; Future directions;

and Medicolegal considerations.[3]

      32.     The Vienna Protocol also recommended comprehensive, internationally-accepted

return-to-play guidelines, specifically:

> When a player shows ANY symptoms or signs of a concussion:
>
> (1)     The player should not be allowed to return to play in the current game or practice.
>
> (2)     The player should not be left alone; and regular monitoring for deterioration is essential.
>
> (3)     The player should be medically evaluated after the injury.
>
> (4)     Return to play must follow a medically supervised stepwise process.
>
> A player should never return to play while symptomatic.  "When in doubt, sit them out!"[4]

      33.     The Vienna Protocol also recommended an internationally-accepted return-to-

play stepwise process as follows:

> Return to play after a concussion follows a stepwise process:
>
> (1)     No activity, complete rest. Once asymptomatic, proceed to level (2).

---

[1] "Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med 2002; 36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full.

[2] The NCAA possessed a copy of the Vienna Protocol.  NCAA00007999-8012.

[3] *Id.*

[4] Summary and agreement statement of the first International Conference on Concussion in Sport, Vienna 2001," Br J Sports Med 2002; 36:6-7 doi:10.1136/bjsm.36.1.6, *available at* http://bjsm.bmj.com/content/36/1/6.full. *See also* NCAA00007999, at 8001.

     (2)     Light aerobic exercise such as walking or stationary cycling.

     (3)     Sport specific training – for example, skating in hockey, running in soccer.

     (4)     Non-contact training drills.

     (5)     Full contact training after medical clearance.

     (6)     Game play.

With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level.  If any symptoms occur after concussion, the patient should drop back to the previous asymptomatic level and try to progress again after 24 hours.[5]

34.     The 3rd International Symposium on Concussion in Sport was held in Zurich, Switzerland, in November, 2008 ("Zurich Conference"), resulting in an update of the Vienna Protocol and Prague Protocol ("Zurich Protocol").[6]

35.     Once again, the Zurich Protocol reaffirmed the need for a graduated stepwise return-to-play process after a concussion, with a 24-hour wait period between each step.  The Zurich Protocol stated:

Return to play protocol following a concussion follows a stepwise process as outlined in Table 1.

---

[5] *Id.*

[6] Consensus Statement on Concussion in Sport:  the 3d International Conference on Concussion in Sport held in Zurich, November 2008, http://bjsm.bmj.com/content/43/Suppl_1/i76.full.pdf+html.

**Table 1**
Graduated return to play protocol

| Rehabilitation stage | Functional exercise at each stage of rehabilitation | Objective of each stage |
|---|---|---|
| 1. No activity | Complete physical and cognitive rest | Recovery |
| 2. Light aerobic exercise | Walking, swimming or stationary cycling keeping intensity <70% maximum predicted heart rate | Increase heart rate |
| | No resistance training | |
| 3. Sport-specific exercise | Skating drills in ice hockey, running drills in soccer. No head impact activities | Add movement |
| 4. Non-contact training drills | Progression to more complex training drills, eg passing drills in football and ice hockey | Exercise, coordination, and cognitive load |
| | May start progressive resistance training) | |
| 5. Full contact practice | Following medical clearance participate in normal training activities | Restore confidence and assess functional skills by coaching staff |
| 6. Return to play | Normal game play | |

> With this stepwise progression, the athlete should continue to proceed to the next level if asymptomatic at the current level. Generally each step should take 24 hours so that an athlete would take approximately one week to proceed through the full rehabilitation protocol once they are asymptomatic at rest and with provocative exercise.  If any post-concussion symptoms occur while in the stepwise programme, the patient should drop back to the previous asymptomatic level and try to progress again after a further 24-hour period of rest has passed.[7]

36.     The Zurich Protocol also reinforced that sports governing bodies, like Major League Soccer and teams like D.C. United, may need to change their rules and/or enforce the rules in order to protect the well-being of athletes who suffer or show signs of concussions, stating:

> Consideration of rule changes to reduce the head injury incidence or severity may be appropriate where a clear-cut mechanism is implicated in a particular sport.  An example of this is in football (soccer) where research studies demonstrated that upper limb to head contact in heading contests accounted for approximately 50% of concussions.  As noted earlier, rule changes may also be needed in some sports to allow an effective off-field medical assessment to occur without compromising the athlete's welfare, affecting the

---

[7] *Id.*

flow of the game or unduly penalizing the player's team.  It is
important to note that rule enforcement may be a critical aspect of
modifying injury risk in these settings; referees play an important
role in this regard.[8]

37.     At the time Mr. Namoff was playing for D.C. United these concussion protocols

were in place.

38.     On or about September 9, 2009, Mr. Namoff sustained a hit to the head while

playing in a game in the District of Columbia against the Kansas City Wizards (now called

Sporting Kansas City).  The hit occurred when Mr. Namoff and an opponent collided causing a

blow to Mr. Namoff's head just behind his right temple by the shoulder blade of the opponent.

There was visible snapping of his neck violently back and to the left.  Mr. Namoff was able to

get up on his own; however, Annunziata, never left the sidelines to examine Mr. Namoff.

Afterwards, Mr. Namoff felt lost and out of it but finished the game.

39.     Following the game, in the locker room, Mr. Namoff told the trainer, Goodstein,

that he did not feel right, that the lights were hazy, and that he had no peripheral vision.  Dr.

Annunziata and Goodstein, did not assess, evaluate, and/or examine Mr. Namoff after the game.

Goodstein told Nadine Namoff, Bryan's wife, that Mr. Namoff had sustained a concussion.

40.     On or about September 10, 2009, Mr. Namoff told Goodstein that he had a

headache.  Mr. Namoff participated in pool/water exercises with the team but stopped after

approximately 25 minutes because he felt terrible.  He experienced the physical symptoms of a

concussion, including, headache, fatigue, and generally not feeling right.  Namoff reported to

Goodstein how he was feeling and continuously advised Goodstein of his headaches.

41.     On September 11, 2009, Mr. Namoff went to the team practice facility and

participated in a film session.  He did not participate in any physical activities as he was still

_____

[8] *Id.*

experiencing the symptoms of a concussion, including, headache, fatigue, and generally not feeling right.

42.     From September 9, 2009 up to and including September 12, 2009, Mr. Namoff was not assessed, evaluated, and/or examined by D.C. United or the team's outside physician prior to being allowed to return to play.

43.     Additionally, despite the availability of Namoff's baseline scores from preseason neurocognitive tests (ImPact) conducted in 2008, Dr. Annunziata, Goodstein, and D.C. United never conducted a repeat ImPact test for comparative purposes after Mr. Namoff's September 9, 2009 concussive injury.

44.     On or about September 12, 2009, D.C. United played against the Seattle Sounders FC in the District of Columbia.  D.C. United was down two starting defenders and the decision was made for Mr. Namoff to play in the game.  Aside from the limited pool exercises, this game was the first time Mr. Namoff had physically exerted himself since the September 9, 2009 game. He played the entire game against the Seattle Sounders FC.  During the game, Mr. Namoff's reaction time was slow and it ultimately turned out to be one of the worst games of his career. Throughout the game, Mr. Namoff experienced and exhibited post-concussive symptoms, which were significantly exacerbated by the end of the game.

45.     Following the game, Mr. Namoff reported to Goodstein and Dr. Annunziata that he was having difficulty focusing, that he was dizzy, that the lights were hazy, and that he did not feel right.  Once again, Dr. Annunziata, Goodstein, and D.C. United did not assess, evaluate, and/or examine Mr. Namoff.

46.     D.C. United's medical staff, and its outside physician were negligent in failing to appropriately diagnose or treat Namoff's concussion.

- 12 -

47.     There is no question that Mr. Namoff was possibly concussed and therefore in need of concussion treatment, pursuant to the consensus protocols discussed above.

48.     Goodstein was aware of Namoff's injury on the day it occurred, as evidenced by his communication with Nadine after the game that day yet medical staff still failed to conduct any examination or provide any formal diagnosis.

49.     D.C. United radio announcer, Tony Limarzi, was in the locker room after the game on the day of Namoff's injury.  In an article released shortly thereafter, Limarzi wrote, "I do remember in the locker room after the game he [Namoff] said he was suffering from blurred vision."

50.     Jenny Roberts, D.C. United team massage therapist, was seated on the medical bench at the time of Namoff's injury.  She remembers the hit and recalls a palpable concern from everyone on the bench immediately after.  Roberts said, based on the severity of the hit, that a concussion definitely should have been suspected and that Namoff should have been evaluated.

51.     Dr. Annunziata was aware of Namoff's injury prior to his return to play as evidenced by an email he sent to Nadine before the game on September 12, 2009, in which he wrote, "Hope Bryan's head is doing okay."

52.     Despite being aware that Namoff had possibly suffered a concussion, D.C. United and its medical staff failed to follow concussion protocols, as set forth below:

- There is no record of any examination or assessment of Namoff at any point after his injury and prior to his return to play on September 12, 2009;

- A post-injury ImPACT test was not performed at any point prior to Namoff's return to play even though a baseline ImPACT score was available for comparison;

- There is no indication of any implementation of a step-wise progression of exertion between the date of injury and Namoff's return to play;

- There is no indication that Namoff's symptoms had fully resolved before he was returned to play;

- During the game on September 12, 2009, Namoff exhibited post-concussive symptoms which progressively got worse throughout the game, yet he was never examined or pulled from the game; and

- At the time of Namoff's injury, neither Major League Soccer nor D.C. United had established any formal concussion protocol policy.

53.     As a direct and foreseeable result of D.C. United's failures, Mr. Namoff was returned to play in violation of best practices for concussion management.

54.     Putting an athlete back in the game in violation of return-to-play best practices can have serious neurological consequences, and it did in Mr. Namoff's case.

55.     As a result of his premature return to play, Namoff suffered a permanent brain injury which has caused, and continues to cause, debilitating cognitive and memory issues, fatigue, headaches, vestibular problems, and visual motion hypersensitivity in addition to emotional distress and general impairment of his enjoyment and quality of life.

56.     Mr. Namoff was forced to prematurely retire from professional soccer and to forfeit his future career plans due to the incapacitating effects of his injury.  Namoff has also incurred substantial medical expenses and will likely continue to require considerable medical care for the remainder of his life.

**B.     Defendants File Mr. Namoff's Lawsuits**

57.     After Defendants represented themselves as competent to pursue such a case, Namoff retained them to file and prosecute through trial personal injury and medical malpractice claims against Dr. Annunziata and Commonwealth Orthopaedics (collectively the "Annunziata Defendants") as well as claims against D.C. United, Soehn and Goodstein (collectively the "D.C. United Defendants").  On March 27, 2012, Namoff executed a retainer agreement with Defendant Fleishman & Shapiro under which the firm would pursue Namoff's claims on a contingency fee basis.  On June 29, 2012, Fleishman & Shapiro executed an addendum to the contingency agreement adding Defendants Cammarata and Chaikin & Sherman as local co-counsel.  This agreement provided that Defendants would take 40% of any recovery obtained on Namoff's behalf and that Defendants would be responsible for all costs.

58.     Before agreeing to represent Mr. Namoff, Defendants interviewed Namoff and reviewed the facts of his case as well as the reports of his treating physicians.

59.     Namoff's medical records contained reports from several physicians including Dr. Annunziata as well as one of the nation's leading concussion specialists, Dr. Robert Cantu.  The reports of all of Namoff's treating physicians were consistent with a diagnosis of post-concussion syndrome.  Defendants had in their possession over 20 such confirming reports prior to filing litigation on Mr. Namoff's behalf.

60.     On or about August 29, 2012, Defendants filed three separate actions in the Superior Court for the District of Columbia captioned, *Bryan Namoff, et al. v. D.C. Soccer LLC d/b/a D.C. United, et al.*, Case No. 12-CA-007050; *Bryan Namoff, et al v. Annunziata, Christopher, et al.*, Case No. 12-CA-008981; and *Bryan Namoff, et al. v. D.C. Soccer LLC, et al.*, Case No. 12-CA-008953 (collectively the "Medical Malpractice Actions").  These actions were subsequently consolidated.

61.     The complaints in the Medical Malpractice Actions alleged the following:

a.      As the team physician making return-to-play decisions, Dr. Annunziata owed a continuing duty to Namoff of exercising that degree of skill, care, caution, diligence, and foresight exercised by others similarly situated in the field providing healthcare services to athletes, including, but not limited to, providing healthcare services in a reasonable and prudent manner with due care and regard to the health and well-being of the team's athletes, including Namoff; and

b.      Dr. Annunziata breached the duties of care owed to Namoff through his negligent management, care, and treatment of Namoff on September 9, 2009 and continuing thereafter, including, but not limited to, the following:

i.      Negligent failure to follow the proper guidelines and protocols for the management and treatment of concussions and return-to-play decisions;

ii.     Negligent failure to conduct post-injury neurocognitive testing (ImPACT) prior to making the return-to-play decision;

iii.    Negligent failure to compare and contrast pre-season neurocognitive testing (ImPACT) with post-injury neurocognitive testing (ImPACT) prior to making the return-to-play decision;

iv.     Negligent failure to properly assess, evaluate, and/or examine Namoff at the time of his injuries;

v.      Negligent failure to properly and safely assess, evaluate, examine, and/or monitor Namoff after his injuries;

vi.     Negligent failure to properly assess, evaluate, examine, and/or follow-up with Namoff prior to making the return-to-play decision;

vii.    Negligent decision to permit Namoff to play in the September 12, 2009 game, three days after sustaining a concussion; and

viii.   Negligent failure to timely refer Namoff for evaluation and treatment.

62.     On May 8, 2014, the court dismissed Namoff's claims against the D.C. United Defendants after rendering summary judgment that the team and its employees were immune from suit under the Workers Compensation Act ("WCA").  However, Namoff retained the right to appeal this decision, and did in fact intend to contest the court's determination that D.C. United is a "special employer" for purposes of the WCA.

**C.    Defendants Negligently Failed to Identify and Disclose Documents Requested During Discovery and Negligently Misrepresented Material Facts Related to Namoff's Claims, Which Lead to a Motion for Sanctions Against Namoff and Defendants**

63.    Despite Namoff's strong case against the medical malpractice defendants, Defendants negligently and intentionally mishandled the Medical Malpractice Actions. Defendants' actions breached both the standard of care owed by all attorneys to their clients as well as Defendants' duty of loyalty to Namoff, their client.

64.    Mr. Namoff's medical malpractice complaint alleged that Namoff, as "a direct and proximate cause" of a series of alleged negligent acts by the Annunziata Defendants, "has suffered serious permanent and disabling damage to his body, including, but not limited to, permanent traumatic brain injury; permanent cognitive deficits and memory problems" and "has suffered, and will in the future suffer a loss of earnings and earnings capacity… and impairment of the enjoyment and quality of a full and complete life."

65.    The complaint plainly put Mr. Namoff's ability to work at issue.

66.    After he retired from D.C. United, Mr. Namoff was unable to work in a sustained manner.  He was physically capable of performing some work-related tasks for short, intermittent periods of time and did make attempts to do so, although even these more limited activities would often leave Namoff exhausted and symptomatic.  At the time of the lawsuit Mr. Namoff was involved with The Soccer Pros, LLC ("Soccer Pros"), a company owned by Namoff which conducted youth soccer camps.  Obviously Namoff's involvement with Soccer Pros was an issue that the medical malpractice defendants would focus on as it related to Namoff's claim for damages arising from his concussion-related injuries.  Mr. Namoff openly and candidly discussed his involvement with Soccer Pros with Defendants.

67.     Defendant law firms, Fleishman & Shapiro and Chaikin & Sherman, specifically represent on their websites that they are accustomed to working with clients with traumatic brain injuries.  Further, in his response to the Colorado bar, Defendant Shapiro points out that "[i]n traumatic brain injury cases, the integrity, character and credibility of the injured plaintiff is vitally important as it is an invisible injury and juries are critical of injuries which cannot be seen."  For these reasons, Defendants should have been particularly vigilant both in learning the specific nature of Mr. Namoff's injuries and in guiding him through the discovery process.  They were neither.

68.     On January 28, 2013, the medical malpractice defendants served an interrogatory on Mr. Namoff asking for employment information as well as document requests which asked for medical records and any documents relating to the damages claimed in Namoff's medical malpractice complaint.

69.     Mr. Namoff signed an answer to the interrogatory, prepared by his lawyers, which identified Soccer Pros and stated that Namoff's responsibilities included "making appearances and signing autographs."  Mr. Namoff also signed a responsive document production which disclosed voluminous medical records and several tax forms.  Mr. Namoff relied on his lawyers to advise him how to properly answer interrogatories and document requests and he relied on his lawyers to undertake the necessary steps to meet his discovery obligations.  Because of Mr. Namoff's cognitive issues, Defendants knew it was vitally important that they use extra care in ensuring that Namoff fully understood his discovery obligations.

70.     On February 10, 2014, the court entered an order compelling Namoff to produce all documents directly relating to his injury and ability to engage in physical activity.

71.     Mr. Namoff relied on his lawyers to advise him on how to properly respond to the order and he relied on his lawyers to undertake the necessary steps to meet his discovery obligations.

72.     On May 20, 2014, the medical malpractice defendants served a subpoena on the Soccer Pros requesting documents related to the business.  This subpoena was served through Mr. Namoff in his capacity as registered agent for the company.

73.     Defendants were responsible for advising Mr. Namoff on how to respond to the subpoena.  Mr. Namoff informed Defendants as to the locations of responsive documents and had no reason to conceal any documents.  Namoff relied on Defendants, as his attorneys, to guide him through the discovery process.

74.     Defendants failed to produce documents which were subject to the various document requests served on Namoff and Soccer Pros.  Specifically, the disclosures prepared by Defendants omitted various emails, two business proposals, and a medical report completed by Dr. Jerry Friedman.

75.     Defendants' failure to produce Namoff's documents was due to their own negligence or intentional actions in derogation of their duty to zealously represent Namoff.  When requested by Defendants, Namoff provided Defendants with unlimited access to his personal email and social media accounts, including all necessary login credentials.  Namoff also informed Defendants of several email addresses, a website, and a social media account related to the Soccer Pros business.  In a phone conversation with Denise Doudiet, a paralegal in Defendant Shapiro's office, Namoff explained how several of the business email accounts linked to one another and involved multiple auto-forwarding functions.  Namoff further clarified that he had hired an IT professional to create the business website and email addresses and that this

person would be able to best explain how the accounts worked.  At the conclusion of the

conversation, Ms. Doudiet admitted her lack of understanding of the email technology, but

reassured Namoff that Defendants nevertheless had the information they needed for discovery

purposes.  Namoff reasonably believed Defendants' representations that they would fulfill their

obligations to represent his interests competently.

76.     Defendants were aware that Namoff regularly deleted emails from both his

personal and business accounts.  Namoff openly acknowledged this fact to Defendants from the

outset of the litigation and he offered a reasonable explanation for why he did so—due to the

auto-forwarding system utilized by Soccer Pros, Namoff's personal email account would become

cluttered over time with duplicates of business correspondence which had forwarded from the

business accounts.  Because Namoff's injury has substantially limited his ability to visually scan

large numbers of documents, clearing these duplicates from his inbox reduced the number of

documents he needed to scan.  Defendants did not at any point advise Namoff that he was

obligated to refrain from deleting emails while his case was pending, nor did they ever instruct

Namoff that deleting emails could be harmful to his case.  Nevertheless, Namoff took extra

precautions to ensure his attorneys had all of the information they needed.  Namoff provided to

Defendants the names and contact information of several individuals who could verify the

existence and contents of any emails which were no longer accessible through Namoff's inboxes.

Namoff explicitly instructed Defendants to confirm with these individuals whether any other

emails existed which Defendants considered relevant.  Defendants did not comply with Namoff's

instructions, and never inquired about emails to even one of the individuals he had identified.

Defendants failed to ask Khary Stockton about emails he sent and received on behalf of Soccer

Pros even after the Soccer Pros subpoena specifically compelled production of "any and all

correspondence, including but not limited to e-mails, between or among any person acting on behalf of the Company, including… Khary Stockton or Khary Stockton Soccer/KSS/KSS Programs, concerning business activities of the company." Mr. Namoff's deletion of emails ultimately became one of the primary bases that the defense used to justify its sanctions motion. Had Defendants done their job in appropriately advising Namoff, this would never have become an issue.

77.     Prior to the deadline for production, Namoff provided Defendants with access to two Soccer Pros business proposals. On June 10, 2014, Nadine emailed the link for a Dropbox containing both proposals to Defendants' paralegal, Denise Doudiet. System records confirm that the Dropbox was accessed by Ms. Doudiet on August 5, 2014. However, as Ms. Doudiet admitted to Namoff in an email dated October 2, 2014, Defendants failed to download or save the proposals. Defendants later failed to produce either document to opposing counsel, and the failure to produce these documents became a material part of the sanctions motion when they should not have had Defendants performed with the care expected of attorneys. Defendants' failure is documented below:

> In checking my old emails, there is an email from Nadine on June 20, 2014 with the Drop Box.
>
> When I click on it, it asks for my login and password. I told Nadine I didn't know how to open it, or what my sign on and password would be.
>
> She recalls us having a conversation where she walked me through this. I don't recall that conversation. Her system showed I "accepted" in on August 5, 2014.
>
> Today she told me to go to dropbox.com, and in there I found a folder called Bryan. I was able to open the shared Bryan drop box, and the 2011 and 2012 Loudon proposals were in there. I don't recall seeing them before. Normally I would have downloaded them to our system, but this had not been done.

> I had not recalled getting Nadine's June 20, 2014 email. It appears
> that this was my error.

78.     On or about July 30, 2014, defense counsel in the Medical Malpractice Actions provided to Defendants all of the documents which it had received pursuant to third-party subpoenas which had been served on various governmental and educational entities the Soccer Pros conducted business with.  The third-party productions included the emails and proposals which had been omitted from Namoff's own document productions.  Yet, even with these documents in hand, Defendants still failed to supplement Namoff's discovery responses before the sanctions motion was later filed.

79.     As a result of Defendants' repeated failures to produce Namoff's documents and their failure to appropriately advise him with regard to his responses during discovery, the Annunziata Defendants filed a motion for sanctions ("Sanctions Motion").

80.     The Sanctions Motion was "based on an intentional pattern and practice of conduct by Plaintiff and his counsel" and sought dismissal of Mr. Namoff's lawsuit as well as financial penalties in the form of attorneys' fees from Mr. Namoff and Defendants.  At the core of the motion was a claim that Mr. Namoff had intentionally concealed his involvement in Soccer Pros.

81.     Even after the Sanctions Motion was filed, Defendants still failed to properly amend Namoff's discovery responses.  In a supplemental disclosure dated October 6, 2014, Defendants did turn over some of the missing emails.  Specifically, that disclosure identified emails accessed from another Soccer Pros email account (tspcamps@gmail.com) which had previously been overlooked by Defendants due to their misunderstanding of the email structure. However, neither the emails which had been deleted from Namoff's accounts nor the two omitted proposals were ever produced by Defendants.

82. Defendants failed to offer any explanation with regard to why these documents were never produced. Specifically, Defendants did not acknowledge to opposing counsel or the court their errors in failing to save the proposals and their negligence in failing to correctly understand the Soccer Pros email structure. Defendants also concealed the fact that they had known Namoff regularly deleted emails in his accounts. Indeed, Defendants failed to file a substantive opposition in response to the Sanctions Motion or make any other legitimate attempt to defend against the motion.

83. Another aspect of the Sanctions Motion were claims that Mr. Namoff altered documents. Specifically, the motion alleged that Mr. Namoff and his counsel altered a particular email thread by "whiting out" the to/from fields within the thread. The defense alleged this was done in an effort to hide the fact that Namoff was sending and receiving emails on behalf of Soccer Pros.

84. This email thread was downloaded as a PDF directly from Namoff's email account by Ms. Doudiet. The blank to/from fields are not "whited out" as the Sanctions Motion alleges, but are merely blank as a product of the application (PopMail) which facilitated the auto-forwarding of Namoff's emails. Furthermore, earlier emails in the thread do identify Namoff as the sender and/or recipient of some of the emails in the thread, weakening the defense's argument that this was an intentional effort to conceal his identity. Thus Mr. Namoff had a convincing response to the claim that he altered emails. Alteration is obviously a serious claim and Mr. Namoff's lawyers should have responded to this allegation.

85. Defendants did not defend against the Sanctions Motion because Defendants had, unbeknownst to Namoff, been responsible for the sequence of events which gave rise to the

motion.  Defendants knew that, if they attempted to defend the Sanctions Motion, their mistakes and the obvious inadequacy of their factual investigations would be revealed.

86.     Defendants knew that their representations about the extent of Namoff's injuries were false.  Namoff never concealed his involvement with the Soccer Pros, nor any other material fact, from Defendants.  Nor did Namoff ever represent to his lawyers or to the court that his disability precluded him from *trying* to work or that his injury rendered him completely incapable of performing any work-related tasks whatsoever.  On the contrary, Namoff explained to Defendants on several occasions that, while his responsibilities for the Soccer Pros were significantly curtailed as a result of his injury, he still retained a limited ability to perform tasks for the business.  Through their many discussions with Namoff, as well as through the multitude of other available sources, Defendants had more than enough opportunity to become fully familiar with the true extent of Namoff's involvement with Soccer Pros.  Specifically:

a.     Defendants met with Namoff's business partner, Khary Stockton, who clearly described Namoff's involvement with the business;

b.     Defendants met with Plaintiff's father, Joe Namoff, who clearly explained that Namoff continued to try to work after his injury even though it was increasingly difficult for him to do so;

c.     Defendants spoke with Namoff's Workers Compensation attorney, Ben Boscolo, who was aware of Namoff's involvement with the business;

d.     Namoff's Social Security Disability Insurance form, which was completed by Defendants, specifies that, as of 2014, Namoff was self-employed and lists several duties Namoff performed for the Soccer Pros;

e.     Namoff's Long Term Disability Activities of Daily Living Form, which was completed by Defendants, specifies that, as of 2013, Namoff was working on the computer (*i.e.*, email, business) on a daily basis;

f.     Namoff provided tax records to Defendants which disclosed income generated through the Soccer Pros from the time of his injury through 2014;

g.     Namoff provided to Defendants the names and contact information of his current and former points of contact at the various entities with which Soccer Pros conducted business;

h.      Namoff provided Defendants with the Soccer Pros business website which contained information about the camps and points of contact; and

i.      Namoff provided Defendants with access to documents which clearly outlined the duties Namoff performed for the Soccer Pros.

87.     In short, Defendants were fully aware of Namoff's involvement with the Soccer Pros and at no point did they advise Namoff that his activities related to the business would pose any problem in his case.  On the contrary, in their discussions with Namoff, Defendants characterized Soccer Pros as an "investment" and they intentionally caused Namoff to believe that his responsibilities for Soccer Pros did not constitute employment for purposes of his case.

88.     Defendants also greatly exaggerated the extent of Namoff's injury with regard to his capabilities in carrying out usual activities of daily living and household chores.  Specifically, Defendants represented in claims for damages, against Namoff's wishes and contrary to the information he had provided them with, that Namoff is in need of a daily aide in order to carry out such basic household activities.

89.     Namoff trusted that his attorneys would competently investigate the facts of his case and disclose information in an honest and credible manner.  Instead, Defendants failed to make reasonable investigations, failed to ensure that all important information was disclosed, and then exposed Namoff to sanctions and caused his Medical Malpractice Actions to be dismissed when they elected not to produce documents that would have exposed their errors to the Court.

90.     Mr. Namoff did nothing wrong and Defendants should have vigorously contested the Sanctions Motion on his behalf.  Mr. Namoff had an explanation for each aspect of the Sanctions Motion that surely would have avoided sanctions against him and allowed him to proceed forward and ultimately make a successful recovery in his case.  Indeed, in response to the Namoff's bar complaints, discussed below, the Defendants thought they had "not just a good case, but a great case"—(absent Mr. Namoff's so-called fraud).

- 25 -

**D.      To Hide Their Negligence, Defendants Coerced Namoff Into Dismissing His Medical Malpractice Claims and Disclaiming Defendants' Conflicts of Interest**

91.     At the time of the Sanctions Motion, Defendants still had expert testimony confirming that Mr. Namoff was injured and that the injuries were caused by the malpractice defendants' negligence.  So, even if Defendants were concerned that Mr. Namoff had somehow exaggerated his injuries, which he did not, there was still no question that he had a good liability case and that, at most, his damages might be less than the Defendants had originally hoped for. Thus, a reasonable lawyer acting in good faith would have defended the Sanctions Motion. Particularly when the lawyer knew that some, if not all, of the discovery failures were his own fault.

92.     Rather than defend their client's interests, and in order to hide their own errors, Defendants coerced Namoff into signing a contract with Defendants (the "Understanding Agreement") which not only dismissed his claims in the Medical Malpractice Actions with prejudice, but also effectively released claims he had against Defendants themselves.

93.     With the Sanctions Motion pending, Defendants called for a meeting at Defendant Cammarata's office on September 26, 2014.  Namoff was not advised to bring independent counsel to the meeting.

94.     At that meeting, Defendants failed to explain to Namoff the Sanctions Motion or the implications of dismissing his Medical Malpractice Actions with prejudice.  Instead, they advised Namoff that, if he continued with the suit, he could be liable for fees in excess of $700,000.00 and could face criminal charges.  Defendants did not inform Namoff that the Sanctions Motion had been filed not only against him individually, but against the attorneys themselves.  Defendants also failed to explain that the motion created a conflict of interest

between Defendants and Namoff, and they never advised Namoff to seek independent counsel before making a decision on how to respond to the motion.

95.     Several days later, on October 2, 2014, Defendants called for a second meeting at Defendant Cammarata's office.  During that meeting, Defendants presented the Namoffs with the Understanding Agreement.

96.     The Understanding Agreement falsely implied that Namoff gave his informed consent to dismissal of the case and denial of the existence of any conflict of interest between Defendants and himself.  The agreement further falsely represented that Namoff admitted responsibility for withholding information from Defendants and the court.

97.     The Understanding Agreement also changed the terms of Namoff's original contingency fee arrangement by obligating Namoff to pay Defendants' outstanding costs.  The agreement did not include the total value of those costs, and instead allowed Defendants to provide a final bill up to 15 days after Namoff had signed.

98.     During the October 2nd meeting, Defendants again stressed that Namoff faced over $700,000.00 in fees and criminal charges if he elected not to dismiss the case.  They demanded that Namoff sign the Understanding Agreement immediately, before leaving their office.  Mrs. Namoff describes the events as follows in the Namoff's State Bar Complaint which they drafted:

> In the next meeting held on October 2, 2014 at the offices of Chaikin, Sherman, Cammarata, & Siegel P.C. we were forced to sign an understanding agreement with our lawyers, obligating us to pay all case expenses (total cost is $126.527.14) our lawyers had incurred in this case, even though our original contract stated all expenses would be contingent. We were told we had to sign this document and the lawyers made it clear we would not leave their office until we did – again, without the opportunity to seek other legal representation. We were never provided the opportunity to understand the document in detail and were led to believe the only

> way we could dismiss the case was by signing this understanding.
> Moreover, I was told to sign this understanding even after the
> lawyers made me sign the non-representation letter in the previous
> meeting. Ultimately, we felt we had no other options, and were
> intimidated and coerced into signing this document.

99.      Although Namoff has always maintained that the statements in the Understanding

Agreement are entirely untrue, he believed, based upon his own attorneys' misrepresentations

and threats, that he had no option other than to sign it.  Defendants made Namoff believe that

dismissal of the case was his only viable option and, further, that dismissal was only possible if

Namoff signed the Understanding Agreement.

100.     On October 20, 2014, upon the advice of Defendants and pursuant to the

fraudulently procured Understanding Agreement, Namoff entered into a Settlement and Release

Agreement ("Settlement") with the defendants in the Medical Malpractice Actions.  On October

23, 2014, final judgment was entered against Namoff and in favor of the malpractice defendants.

101.     In a subsequent disciplinary proceeding before the Colorado Attorney Regulation

Counsel ("ARC"), Defendant Shapiro was found to have violated the Rules of Professional

Conduct, specifically Colo. RPC 1.4(b), which requires a lawyer to explain a matter to the extent

reasonably necessary to permit the client to make informed decisions regarding the

representation.

102.     The ARC found that Defendant Shapiro failed to reasonably explain either the

Sanctions Motion or the Understanding Agreement to his client, Namoff.  The D.C. Offices of

Bar Counsel rejected the Namoff's State Bar Complaint based on Defendant Cammarata's

presentation of the facts.

103.     For example, in defense of the D.C. Bar Complaint, Defendant Cammarata relied

on a conversation he had with Terry Buehler, a lawyer the Namoffs eventually retained to advise

them on paying the Defendants' costs.  According to Cammarata, Buehler was sympathetic to the Defendants' feelings of betrayal by the Namoffs.  This is a false statement.

104.     Buehler spoke with Cammarata and Shapiro several times after the Namoffs hired him.  He believed (and still believes) that the Understanding Agreement was voidable/void because it was obtained contrary to the ethical codes of both D.C. and Colorado.  He communicated to Cammarata and Shapiro, his belief that it was unethical to coerce Namoff into signing a document, which was clearly favorable to the attorneys and not to Namoff, without independent representation.  Buehler confirms that, had Namoff sought his advice earlier, Buehler would have advised him not to sign the agreement and not to dismiss his case.

105.     Mr. Buehler will confirm that the Namoffs did not "volunteer" to pay the attorneys' costs as Cammarata informed the D.C. Bar Office.  And, that when he confronted Defendants about the unethical nature of the contract and his belief that it was unenforceable, the attorneys threatened that Namoff could either pay voluntarily, or they would sue.  When Buehler communicated this information back to the Namoffs, the Namoffs were so exhausted and overwhelmed with the threat of another round of litigation, that they asked Buehler to just assist them with negotiating repayment rather than fighting the lawyers.  Buehler did make an offer to Defendants on December 22, 2014, on the Namoffs behalf to pay $43,000 plus $10,000 each quarter through 2015.  Under this arrangement, the Namoffs would have ultimately paid approximately 2/3 of the total outstanding bill.  Buehler recalls, however, that the Defendants rejected the offer outright and explicitly refused to negotiate any discount whatsoever.  Eventually, the lawyers did agree to accept installment payments, but Buehler says they only did so because they knew the Namoffs simply did not have the financial means to pay the full amount up front.  Nevertheless, Defendants repeatedly harassed the Namoffs for immediate

- 29 -

payment and ultimately, the Namoffs paid every cent of the substantial bill which totaled $126,527.14.

106.     Buehler will testify that the Defendants' claims that Mr. Namoff intentionally hid things from them, is "ludicrous" given Namoff's cognitive impairments.  Buehler does not believe Mr. Namoff is capable of effectively carrying out a scheme intended to conceal specific information from his attorneys or the court.  Alternatively, Buehler believes the Defendants failed to diligently search for discoverable information and documents, and that they were simply overwhelmed by superior lawyering by opposing counsel.

**E.     The Damage to Namoff**

107.     But for Defendants' malpractice, Namoff would have won the Medical Malpractice Actions and would have been awarded the following compensatory damages:

> a.     Past, present, and future medical expenses;
>
> b.     Past and present lost earnings;
>
> c.     Future lost earning capacity; and
>
> d.     Emotional distress, pain, and suffering.

108.     Namoff also would have been awarded punitive damages based on the willful nature of the medical malpractice defendants' negligent conduct.

109.     In addition, as a direct and proximate result of Defendants' malpractice, Namoff's Workers Compensation benefits were cut off in October 2014.  As acknowledged in a Stipulation approved by the District of Columbia Department of Employment Services on November 26, 2012, Namoff's injury arose out of and in the course of his employment with his employer, therefore entitling him to weekly Workers Compensation benefits at the 2009 maximum weekly rate of $1,355.00.  Namoff was entitled to receive such benefits on a continuing basis until a demonstrable change in his condition.

110.     As a result of Defendants' malpractice and their dismissal of Namoff's case without any explanation for the allegations in the Sanctions Motion, the prior award of Workers Compensation benefits was terminated based on the incorrect notion that Namoff was not actually disabled.  Namoff has been forced to re-litigate his Workers Compensation claim in a case that is still pending.  Since October 2014, Namoff has not received any payments from Workers Compensation and has been forced to cover the cost of his continuing medical expenses out of pocket and through his personal medical insurance.

## V.     CAUSES OF ACTION

### COUNT I

### Fraud and Fraudulent Inducement

111.     Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

112.     Defendants knowingly and intentionally made false representations of material fact to Namoff in order to obtain his consent to the Understanding Agreement and the Settlement Agreement.  Specifically, and without limitation, Defendants committed fraud against Namoff in the following respects.

**A.**     **First Instance – The Sanctions Motion Was Directed Solely To Namoff**

113.     Defendants failed to tell Namoff that sanctions were brought against both Namoff and Defendants.

114.     The fact that Defendants faced the same sanctions as Namoff was material because it created an obvious conflict of interest between Namoff and the Defendants.  The presence of such a conflict was relevant to Namoff's decision on how to respond to the Sanctions Motion and whether to proceed with his case.  This fact was pertinent to Namoff's decision to sign the Understanding Agreement.

003173-11 939284 V1

115.    Defendants knew that the Sanctions Motion requested sanctions against both Namoff and themselves.

116.    Defendants omitted this fact in an effort to make Namoff falsely believe that they continued to act in his best interest and that he should heed their advice to dismiss the case rather than fight the motion.  Defendants knew that if Namoff was aware of the conflict and the potential that Defendants' advice may be skewed by their own personal interests, he would likely question that advice.  The lawyers sought to make Namoff believe they had no need to defend their own liability and that they had no reason to improperly coerce Namoff into signing the Understanding Agreement against his best interests.

117.    Namoff signed the Understanding Agreement because his lawyers advised him that signing the agreement was in his best interests.  Had he been aware that the lawyers faced the same threat of sanctions under the motion, Namoff would have been alerted to the possibility that the lawyers could be responsible for the violations alleged, and/or that they had motive to make it appear that Namoff admitted sole responsibility.

**B.    Second Instance – The False Threats To Namoff**

118.    Defendants threatened Namoff that financial ruin and criminal charges would follow if he did not dismiss his case.  They failed to tell Namoff that he had good defenses to the Sanctions Motion and that he had the option to have the lawyers defend the motion even if doing so would require the lawyers to take responsibility for their own errors.

119.    The defensibility of Namoff's liability under the motion was material because it was a central factor in Namoff's decisions on how to proceed and whether or not to sign the Understanding Agreement.

120.    Defendants knew that legitimate defenses existed with regard to each of the allegations the Sanctions Motion, at least with respect to Namoff's personal liability.

121.     Defendants made these representations in an effort to cause Namoff to falsely believe he had no viable option to fight the Sanctions Motion and that dismissal of his case was the only option if he wanted to avoid financial ruin and criminal liability.  Defendants knew if Mr. Namoff defended the Sanctions Motion, the attorneys' own mistakes, which were likely indefensible, would be brought to light.  Defendants sought to avoid the potentially substantial financial sanctions and the damage to their professional reputations that would almost certainly ensue if their incompetence in handling Namoff's case was revealed.

122.     Mr. Namoff signed the Understanding Agreement because he believed he had no other option than to dismiss his case and because his lawyers threatened that they would not assist him in dismissing the case unless he signed the agreement.  If Namoff had been aware of the truth, he would not have signed the agreement.

## C.     <u>Third Instance – Failure to Advise Namoff to Seek Counsel</u>

123.     Defendants failed to advise Namoff to seek independent counsel after the conflict of interest arose.

124.     The fact that a conflict of interest had arisen and it was therefore advisable for Namoff to seek independent counsel was material because the advice of such independent counsel would have factored into Namoff's decision on how to proceed and whether or not to sign the Understanding Agreement.

125.     Defendants knew that a conflict of interest existed once the Sanctions Motion was filed against both them and Namoff.

126.     Defendants omitted this advice in an effort to cause Namoff to falsely believe that they continued to act in his best interests and that he should heed their advice to dismiss his case rather than fight the motion.  They knew if Namoff became aware of the significance of the

conflict and sought outside counsel, that outside counsel would likely advise him not to sign the Understanding Agreement or to dismiss his case.

127.    Based on Defendants' representations, Namoff signed the Understanding Agreement without the advice of independent counsel.

**D.      Fourth Instance – Cover Up of Defendants' Own Wrongdoing**

128.    Defendants failed to adequately disclose that they were aware that at least some, if not all, of the discovery mistakes were their own fault.

129.    Defendants' responsibility for any portion of the allegations in the Sanctions Motion was material to Namoff's understanding with regard to his own liability and the options he had available to him.

130.    Defendants knew they, and not Namoff, were solely responsible for the omission of the two proposals mentioned in the Sanctions Motion.

131.    Defendants' paralegal did copy the Namoffs on an email she sent to Shapiro/Cammarata in which she explained that she made an error in not saving the proposals Mrs. Namoff had forwarded to her.  However, this email was sent to Mr. Namoff on October 2, 2014, the same day he was asked to sign the Understanding Agreement.  Mr. Namoff did not become aware of this email until after he had signed the agreement.  Defendants intentionally provided no explanation during the meeting about how they were responsible for their paralegal's mistake or how this mistake could factor into Namoff's potential defense against the Sanctions Motion.  Again, Defendants' actions were aimed at keeping Namoff in the dark about their own mistakes.

132.    Namoff signed the Understanding Agreement and agreed to dismiss his case in large part because he was completely unaware that his own attorneys were responsible for some of the allegations.

- 34 -

**E.**     **Fifth Instance – Additional Cover Up of Defendants' Wrongdoing**

133.     Defendants failed to disclose to Namoff that Defendants had been in possession of all of the emails in the Sanctions Motion months before the motion was filed.

134.     The fact that the lawyers had all of the emails—including those they claim Namoff "withheld" from them—and had ample opportunity to identify missing documents and supplement Namoff's discovery disclosures was material because it is evidence that Defendants were at fault for the emails omitted during discovery.

135.     Defendants were aware that they had received documents from defense counsel's subpoenas well before the Sanctions Motion brought those documents to light.

136.     At the time, Defendants informed Namoff that they had come into possession of new materials, but assured him that they had reviewed the documents and found nothing problematic and nothing that required supplementation of his own disclosures.  Once the Sanctions Motion was filed, Defendants failed to explain to Namoff that the documents subject to the motion were the same documents they had previously reviewed.  They did not make Namoff aware of this fact because, if they had done so, Namoff would have learned that his lawyers could likely have avoided the Sanctions Motion altogether.

137.     Namoff signed the Understanding Agreement because he was unaware that Defendants were responsible for the various discovery mistakes.  Had he been aware of their mistakes, Namoff would not have been coerced into thinking he had no possibility of successfully defending his own liability under the motion.

138.     The totality and cumulative effect of each of these misrepresentations and/or omissions caused Mr. Namoff to sign the Understanding Agreement and Settlement Agreement, and he would not have done so but for Defendants' misrepresentations and/or omissions.

139.    Namoff reasonably relied on the misrepresentations of Defendants, his own attorneys, to his detriment.  Mr. Namoff's reliance was reasonable given the difference in sophistication between the parties and Mr. Namoff's impairments of which Defendants were aware.

140.    Defendants committed the foregoing acts knowingly, with intention to induce Namoff to dismiss his claims in the Medical Malpractice Actions with prejudice and release any claim against the Defendants.  In doing so, Defendants acted solely in their own self-interests and to the detriment of Namoff, including by concealing their errors and omissions in handling the case, and receiving payment for costs in substantial amounts.

141.    As a direct and proximate cause of Defendants' foregoing actions or failures to take action, Namoff suffered substantial damages in an amount to be determined at trial.

## COUNT II

### Legal Malpractice – Negligence

142.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

143.    Defendants owed Namoff a duty to exercise the same legal skill as a reasonably competent attorney and to use reasonable care in determining and implementing a strategy to be followed to achieve Namoff's legal goals.  Specifically:

a.    Defendants had a duty to make a reasonable inquiry into and analysis of the factual and legal elements of the problem and to use methods and procedures meeting the standards of competent practitioners;

b.    Defendants had a duty to explain all matters to the extent reasonably necessary to permit Namoff to make informed decisions regarding the representation;

c.    Defendants had a duty to advise Namoff and any other persons likely to have relevant information, of the requirement to preserve potentially

- 36 -

relevant evidence as well as a duty to explain the types of information that may constitute potentially relevant evidence;

    d.    Defendants had a duty to obtain Namoff's informed consent to continue with the representation in the event that the Defendants' professional judgment on behalf of Namoff would be or reasonably could have been adversely affected by Defendants' own financial, business, property, or personal interests;

    e.    Defendants had a duty to pursue reasonable efforts to assure that documents and other information subject to proper discovery requests were produced; and

    f.    Defendants had a duty to supervise the actions of their subordinate attorney and non-attorney employees.

144.    In the course of handling the Medical Malpractice Actions, Defendants negligently failed to act with the degree of competence generally possessed by attorneys in the state who handle legal matters similar to Namoff's.

145.    Defendants breached this duty by the actions alleged above, including, without limitation, as follows:

    a.    Defendants failed to exercise reasonable care under the circumstances in their legal services rendered and advice given to Namoff;

    b.    Defendants failed to exercise reasonable care under the circumstances because they failed to adequately familiarize themselves with the structure of Namoff's email accounts;

    c.    Defendants failed to exercise reasonable care under the circumstances because they undertook review and production of documents in discovery independently and subsequently failed to produce discoverable documents which they had in their possession;

    d.    Defendants failed to exercise reasonable care under the circumstances in their failure to advise Namoff of their numerous conflicts of interest and the consequences thereof;

    e.    Defendants failed to exercise reasonable care under the circumstances in their failure to obtain a waiver of their multiple conflicts of interest;

    f.    Defendants failed to exercise reasonable care under the circumstances because they did not advise Namoff of his duty to preserve relevant evidence;

g.      Defendants failed to exercise reasonable care under the circumstances because they put their own financial interests before the interests of their client, Namoff;

h.      Defendants failed to exercise reasonable care under the circumstances because they failed to explain and concealed the true nature and implications of the Sanctions Motion;

i.      Defendants failed to exercise reasonable care under the circumstances because they failed to explain and concealed the true nature and implications of the Understanding Agreement; and

j.      Defendants failed to exercise reasonable care under the circumstances because Defendant Shapiro failed to supervise and monitor the services rendered and activities by his agent and paralegal, Denise Doudiet.

146.    As a direct and proximate cause of the foregoing actions or failure to take action by Defendants, Namoff suffered substantial damages in an amount to be determined at trial.

## COUNT III

## Legal Malpractice – Breach of Contract

147.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

148.    In agreeing to serve as Namoff's attorneys, Defendants undertook the duty to perform legal services on his behalf with reasonable care under the circumstances, and to faithfully and loyally undertake his representation.

149.    Defendants breached that agreement by the actions, or failures to take action, alleged herein, including without limitation:

a.      Defendants failed to exercise reasonable care under the circumstances in their legal services rendered and advice given to Namoff;

b.      Defendants failed to exercise reasonable care under the circumstances because they failed to adequately familiarize themselves with the structure of Namoff's email accounts;

c.      Defendants failed to exercise reasonable care under the circumstances because they undertook review and production of documents in discovery

independently and subsequently failed to produce discoverable documents which they had in their possession;

d.    Defendants failed to exercise reasonable care under the circumstances in their failure to advise Namoff of their numerous conflicts of interest and the consequences thereof;

e.    Defendants failed to exercise reasonable care under the circumstances in their failure to obtain a waiver of their multiple conflicts of interest;

f.    Defendants failed to exercise reasonable care under the circumstances because they did not advise Namoff of his duty to preserve relevant evidence;

g.    Defendants failed to exercise reasonable care under the circumstances because they put their own financial interests before the interests of their client, Namoff;

h.    Defendants failed to exercise reasonable care under the circumstances because they failed to explain and concealed the true nature and implications of the Sanctions Motion;

i.    Defendants failed to exercise reasonable care under the circumstances because they failed to explain and concealed the true nature and implications of the Understanding Agreement; and

j.    Defendants failed to exercise reasonable care under the circumstances because Defendant Shapiro failed to supervise and monitor the services rendered and activities by his agent and paralegal, Denise Doudiet.

150.    As a direct and proximate consequence of the foregoing breaches, Namoff suffered substantial damages in an amount to be determined at trial.

## COUNT IV

### Legal Malpractice – Breach of Fiduciary Duty

151.    Plaintiff incorporates by reference the allegations in the above paragraphs as if fully set forth herein.

152.    As Namoff's attorneys, Defendants owed him fiduciary duties, including, but not limited to, a duty of good faith and full disclosure and a duty of loyalty.

153. As fiduciaries of Namoff, Defendants were obligated to zealously represent his interests, including the disclosure of any conflicts of interest that might impair their ability to represent Namoff.

154. Defendants breached this duty by the actions alleged above, including, without limitation, as follows:

    a.    Defendants breached their fiduciary duties in the services they rendered and the advice they gave to Namoff;

    b.    Defendants breached their fiduciary duties because they failed to adequately familiarize themselves with the structure of Namoff's email accounts;

    c.    Defendants breached their fiduciary duties because they undertook review and production of documents in discovery independently and subsequently failed to produce discoverable documents which they had in their possession;

    d.    Defendants breached their fiduciary duties by failing to advise Namoff of their numerous conflicts of interest and the consequences thereof;

    e.    Defendants breached their fiduciary duties by failing to obtain a waiver of their multiple conflicts of interest;

    f.    Defendants breached their fiduciary duties because they did not advise Namoff of his duty to preserve relevant evidence;

    g.    Defendants breached their fiduciary duties because they put their own financial interests before the interests of their client, Namoff;

    h.    Defendants breached their fiduciary duties because they failed to explain and concealed the true nature and implications of the Sanctions Motion;

    i.    Defendants breached their fiduciary duties because they failed to explain and concealed the true nature and implications of the Understanding Agreement; and

    j.    Defendants breached their fiduciary duties because Defendant Shapiro failed to supervise and monitor the services rendered and activities by his agent and paralegal, Denise Doudiet.

155. As a direct and proximate cause of the foregoing actions or failures to take action by Defendants, Namoff suffered substantial damages in an amount to be determined at trial.

- 40 -

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby demands judgment in his favor and against the

Defendants and respectfully requests that this Court enter an Order granting Plaintiff:

A.      An injunction nullifying and voiding the Understanding Agreement;

B.      Disgorgement of the full amount paid by Plaintiff to Defendants for costs

advanced ($126,527.14);

C.      Damages arising out of Defendants' failure to perform their work properly and as

promised and represented to Plaintiff, and their failure to assist and support Plaintiff in

connection with the Sanctions Motion, in an amount to be proved at trial;

D.      Punitive damages based on the fraudulent nature of Defendants' conduct;

E.      Pre-judgment and post-judgement interest; and

F.      Such other and further relief as this Court deems equitable, just and proper.

## JURY DEMAND

Plaintiff hereby requests a trial by jury.

DATED:  April 4, 2017                    Respectfully submitted,

                                         HAGENS BERMAN SOBOL SHAPIRO LLP


                                         By:    */s/ Jennifer Fountain Connolly*
                                         Jennifer Fountain Connolly (DCB #1019148)
                                         1701 Pennsylvania Ave. NW, Suite 300
                                         Washington, D.C.  20006
                                         Telephone:  (202) 248-5403
                                         Facsimile:  (202) 580-6559
                                         jenniferc@hbsslaw.com

                                         Steve W. Berman (*pro hac pending*)
                                         Emilee Sisco (*pro hac pending*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         1918 Eighth Ave., Suite 3300
                                         Seattle, WA  98101
                                         Telephone:  (206) 623-7292
                                         Facsimile:  (206) 623-0594
                                         steve@hbsslaw.com

                                         *Attorneys for Plaintiff*